**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 11-cv-00447-WJM-CBS

STANDARD STEAM TRUST LLC,

      Plaintiff,

v.

WINDFALL MINERALS, LLC,

      Defendant.

---

**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS,
GRANTING PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND
GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

The claims in this action arise out of a lease for land owned by Windfall Minerals in Elko County, Nevada.  Before the Court are the following motions: (1) Standard Steam's Motion for Judgment on the Pleadings (ECF No. 66); (2) Windfall Minerals's Motion for Summary Judgment (ECF No. 75); and (3) Standard Steam's Motion for Partial Summary Judgment (ECF No. 77).  For the reasons set forth below, summary judgment will be entered on all claims except Windfall Minerals's counterclaim for breach of contract.

## I.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[1]  Fed. R. Civ. P.

---

[1]  A different legal standard applies to Standard Steam's Motion for Judgment on the Pleadings and will be discussed in the relevant section below.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *Quaker State Mini-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995); *Houston v. Nat'l General Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTUAL BACKGROUND

Standard Steam is a Colorado limited liability corporation that is in the business of acquiring, exploring, and developing industrial scale geothermal energy resources in the western United States.  (Compl. (ECF No. 2) ¶ 5.)  Windfall Minerals is Nevada Limited Liability Corporation that owns the mineral rights in land in Elko County, Nevada.  (Answer (ECF No. 11) ¶ 6.)

In 2007, Standard Steam began leasing land in the Marys River area of Elko County, Nevada.  (Compl. ¶ 7.)  Standard Steam focused its efforts on land owned by

the United States and managed by the Bureau of Land Management.  (WM SOF 2.)[2]

Standard Steam authorized a contractor named Greg Hahn to inspect lands in this area

for potential exploration opportunities.  (WM SOF 22.)  While inspecting the Marys River

area, Hahn became aware that the Marys River ran through the land and he assumed

that this river and its riparian area would have to be avoided during any geothermal

exploration.  (WM SOF 6.)

On August 5, 2008, Standard Steam was awarded two leases in a BLM auction.

(WM SOF 24.)  Materials distributed in conjunction with the BLM lease sale stated that

BLM restrictions prohibited "ground disturbance within 400 feet of streams and banks."

(WM SOF 16.)  These materials also stated that the BLM would consider proposed

exploration and development activities on a case-by-case basis.  (WM SOF 14.)

Standard Steam learned that the mineral rights to much of the land in the Marys

River area had been severed from the surface rights and that Windfall Minerals was the

owner of those mineral rights.  (Compl. ¶ 7.)  Therefore, on October 22, 2008, the

parties entered into a Geothermal Lease and Agreement ("Lease") and an Addendum

Amendment to Geothermal Lease and Agreement ("Addendum").  (ECF No. 2-1.)

Generally[3], the Lease gave Standard Steam all of Windfall Minerals's interests in the

---

[2]  Because all of the claims are before the Court on cross-motions for summary judgment, when possible, the Court will rely only on uncontested facts.  For ease of reference, the Court will primarily cite the facts as they appear in Windfall Minerals' Statement of Facts (Court "WM SOF") set forth in its Motion for Summary Judgment as it is the most complete recitation of facts in the record.  Though it refers only to Windfall Minerals' Motion for Summary Judgment, the Court has reviewed all of the facts and evidence cited by the parties in the three pending motions.

[3]  Specific provisions of the Lease and Addendum will be discussed in detail as necessary in the Analysis section below.

geothermal, mineral, and subsurface water on certain parcels of property (the "Lands").
(*Id*.)  Standard Steam was to pay Windfall Minerals rent and royalties on the Lands and
Standard Steam retained the right to terminate the Lease as to the entire property or
any portion in its sole discretion.  (Lease § 5.3, 6, 7.)  The Addendum set out a bonus
payment that Standard Steam was to make if and/or when certain events occurred.
 (ECF No. 2-1 at 23-24.)  The majority of the dispute in this case centers around
whether these events occurred so as to trigger the bonus payment.

The Lease involved only the mineral rights to the Lands and, therefore, Standard
Steam was still required to negotiate for rights to the surface before it could begin
exploration.  (Lease § 1.2; WM SOF 33.)  The surface rights to the Lands was held by
the following entities: WBW Ranch, Rafter Diamond Ranches, Cross Ranch, and BLM.
(WM SOF 37.)  Standard Steam acquired nine geothermal leases from the BLM in
September 2009 and eight more in June 2010.  (WM SOF 66 & 67.)  On May 1, 2009,
Standard Steam leased the surface rights to the land owned by Rafter Diamond
Ranches.  (ECF No. 75-29.)  On April 13, 2010, Standard Steam leased the surface
rights to the land owned by WBW Ranch.  (WM SOF 88.)  The record is unclear as to
whether Standard Steam entered into a lease or made any other arrangement with
Cross Ranches.

On January 20, 2010, the BLM granted Standard Steam permission to drill
fifteen temperature gradient wells on land to which it held the surface rights.  (WM SOF
90.)  However, the BLM restricted Standard Steam from drilling between May 15 and
August 15 due to sage-grouse brooding and mule deer crucial seasons.  (*Id*.)  On April
1, 2010, the BLM granted Standard Steam permission to drill ten more temperature

gradient wells.  (WM SOF 98.)  Additionally, the State of Nevada issued Standard

Steam permits to drill twenty-nine temperature gradient wells between February 5 and

March 24, 2010.  (WM SOF 100.)

Between March 12 and May 18, 2010, Standard Steam drilled five wells on land

in which the surface rights were held by the BLM and the mineral rights were owned by

Windfall Minerals.  (WM SOF 103.)  Standard Steam also drilled three wells on land in

which the surface was owned by Cross Ranch and the mineral rights by Windfall

Minerals.  (WM SOF 106.)  All of the wells drilled by Standard Steam were "test" wells

used to explore geothermal potential as opposed to production wells which would be

used to produce geothermal reserves.  (WM SOF 11.)

On October 20, 2010, Standard Steam sent Windfall Minerals a letter stating that

it was surrendering a portion of the Lands but would retain other portions.  (ECF No. 75-

52.)  Based on the amount of land that Standard Steam had decided to retain, Standard

Steam remitted $ 107,557.88 as the remaining bonus payment and $478.04 for 2010

annual rent.  (*Id.*)

On October 26, 2010, Windfall Minerals sent Standard Steam a confidential

settlement letter notifying Standard Steam that Windfall Minerals believed it was in

default under the terms of the Lease.  (WM SOF 141.)  Windfall Minerals returned the

checks tendered by Standard Steam on October 20, 2010.  (WM SOF 143.)

On these facts, Standard Steam initiated the instant action.

## III.  ANALYSIS

The Lease provides that the "validity, construction, and performance of this

Lease shall be governed and construed in accordance with the laws of the state in

which the Lands are located." (Lease § 24.)  Because the Lands are located in

Nevada, the Court will apply Nevada law to the issues presented here.

Standard Steam brings the following claims: (1) fraudulent misreprentation; (2)

breach of warranty; and (3) mutual mistake/force majure.  Windfall Minerals brings

counterclaims for breach of contract and breach of the duty of good faith and fair

dealing.  In their various motions, the parties move for judgment on all claims.  The

Court will address each claim in turn below.

## A.     Breach of Contract

To prevail on a breach of contract claim under Nevada law, a plaintiff must

demonstrate: (1) the existence of a valid contract; (2) a breach by the defendant; and

(3) damages resulting from defendant's breach.  *Saini v. Int'l Game Tech.*, 434

F.Supp.2d 913, 919–20 (D. Nev. 2006).  There are two motions pending that relate to

Windfall Minerals's breach of contract claim: (1) Standard Steam's Motion for Judgment

on the Pleadings; and (2) Windfall's Motion for Summary Judgment.  Because the legal

standard is different for these motions, they will be addressed separately.

### 1.     Standard Steam's Motion for Judgment on the Pleadings

Standard Steam argues that judgment on the pleadings is appropriate with

respect to Windfall Minerals's breach of contract claim.  A motion for judgment on the

pleadings under Federal Rule of Civil Procedure 12(c) is governed by the same

standards as a motion to dismiss under Rule 12(b)(6).  *See Atl. Richfield Co. v. Farm

Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000); *Mock v. T.G. & Y. Stores

Co.*, 971 F.2d 522, 528 (10th Cir. 1992).  To survive a Rule 12(b)(6) motion, "[t]he

complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

The Addendum to the Lease set forth a bonus structure whereby Standard Steam would become obligated to make payments to Windfall Minerals if certain events occurred.  The Addendum provided that the total "Potential Bonus Payment" was $4,321,121.60.  (Addendum § 2.)  Upon execution of the Addendum, Standard Steam paid Windfall Minerals $270,070.10 as the "Initial Bonus Payment."  (*Id*. § 3 ¶ 1.)  The "Remaining Bonus Payment" was defined as "the Potential Bonus Payment for any net acreage minus the Initial Bonus Payment for such acreage."  (*Id*. § 3 ¶ 2.)  The Addendum stated: "If [Standard Steam] determines to terminate the Lease for all or a portion of the Lands, [Standard Steam] shall not be obligated to pay to [Windfall Minerals] the balance of the Potential Bonus Amount for the acres being terminated." (*Id*. § 3 ¶ 2.)

Under the terms of the Lease, Standard Steam became obligated to make the Remaining Bonus Payment at the earlier of the "Lease Date" or the "Decision Date". (Addendum § 3 ¶ 3.)  The "Lease Date" is defined as "that date at which 100% of the

ownership interests (surface and geothermal) in the Lands have signed leases or made other satisfactory arrangements with [Standard Steam] for [Standard Steam's] development and use thereof." (*Id*.) The "Decision Date" is the "date upon which [Standard Steam] determines, in its sole discretion, to maintain the Lease on all or any portion of the Lands even though it has leases or arrangements with less than 100% of the ownership interests (surface and geothermal)." (*Id*.) If the Lease Date occurred before the Decision Date, Standard Steam was required to pay the "Remaining Bonus Payment on all of the Lands on the Lease Date." (*Id*. ¶ 4.)

Windfall Minerals alleges that Standard Steam breached the Lease by failing "to make the Remaining Bonus Payment for all Lands 100% under Lease with surface access and use on the Lease Date." (Counterclaim at 13.) In response, Standard Steam points to the provision in the Lease that gave Standard Steam "sole discretion" to "decide to terminate the Lease as to all or such portions of the Lands". (Addendum § 3 ¶ 2.) Standard Steam also cites the provision stating that Standard Steam was not "obligated to pay to [Windfall Minerals] the balance of the Potential Bonus Amount for the acres being terminated". (*Id*.) Based on these two provisions, Standard Steam contends that it was not obligated to make the Remaining Bonus Payment for the lands to which it terminated the Lease via its October 20, 2010 letter. (ECF No. 107 at 6-8.)

However, if the Lease Date occurred before Standard Steam decided to terminate the Lease as to all or a portion of the Lands, then Standard Steam was obligated to make the full Remaining Bonus Payment on all of the Lands. (Addendum § 3 ¶ 3.) Standard Steam's Complaint admits that it terminated the Lease as to a portion of the Lands on October 20, 2010. (Compl. Ex. B.) Windfall Minerals's

Counterclaim alleges that Standard Steam entered into various lease arrangements in 2009 and 2010 and that "[t]he Lease Date, as set forth in the Addendum, occurred before October 20, 2010."  (Counterclaim ¶ 32.)  Because Windfall Minerals has alleged that the Lease Date occurred before Standard Steam terminated the Lease as to a portion of the Lands, and it is undisputed that Standard Steam did not make the full Remaining Bonus Payment, the Court finds that Windfall Minerals has alleged sufficient facts to state a claim for breach of contract.  (Addendum § 3 ¶ 4.)

Standard Steam also argues that Windfall Minerals's allegation regarding the Lease Date is insufficient to state a claim because, under the terms of the Addendum, Standard Steam had the sole discretion to determine when it had "satisfactory surface access".  (ECF No. 66 at 13.)  Standard Steam contends that, in its discretion, it determined that it never had "satisfactory surface access" and, therefore, the Lease Date could not have occurred.  (*Id.*)

The Court notes that the phrase "satisfactory surface access" does not appear in the Lease or the Addendum.  Rather, the relevant inquiry is whether Standard Steam had made "other satisfactory arrangements" for use and development of 100% of the Lands so as to trigger the Lease Date.  (Addendum § 3 ¶ 3.)  The term "satisfactory" is not defined in the Lease or the Addendum.  While the Addendum specifies that Standard Steam has the sole discretion to make a number of determinations, it does not state that Standard Steam has the sole discretion to determine if "other satisfactory arrangements" have been made so as to trigger the Lease Date.  In fact, the term "discretion" does not appear anywhere within the definition of "Lease Date".  (*Id.*)  Accordingly, the Court disagrees with Standard Steam's argument that it had the sole

discretion to determine if it had made "other satisfactory arrangements" with 100% of the ownership interests in the Lands.

Because Windfall Minerals has alleged that the Lease Date occurred before Standard Steam terminated the Lease as to a portion of the Lands, the Court finds that Windfall Minerals has stated a claim for breach of contract.  Therefore, Standard Steam's Motion for Judgment on the Pleadings is denied.

      2.    <u>Windfall Minerals's Motion for Summary Judgment</u>

Windfall Minerals moves for summary judgment on its breach of contract claim. (ECF No. 75 at 35.)  As with the Standard Steam's Motion for Judgment on the Pleadings, the relevant issue here is whether the Lease Date occurred prior to Standard Steam's termination of the Lease as to a portion of the Lands.[4]  (*Id*. at 36-38.)

As set forth above, the Lease Date was the date upon which Standard Steam had either entered into leases or "made other satisfactory arrangements" for "development and use" of 100% of the surface and geothermal interests in the Lands. (Addendum § 3 ¶ 3.)  It is undisputed that Standard Steam had 100% of the mineral or geothermal rights in the Lands under lease as of May 2009.  (SOF 86.)  The record shows that the surface rights were owned by at least four different entities.  Standard Steam entered into leases with two of these entities on May 1, 2009 (SOF 87) and April 13, 2010 (SOF 88).

---

[4]  Windfall Minerals also argues that multiple Lease Dates occurred each time Standard Steam acquired the surface rights to a portion of the Lands.  (ECF No. 75 at 36-37.)  The Court finds no support for this argument in the Lease, which provides for only <u>one</u> Lease Date, that being the date upon which Standard Steam has entered into leases or made other satisfactory arrangements with 100% of the ownership interests in the Land.

In addition to these leases, Standard Steam made arrangements with the other entities that allowed it to drill test wells on certain portions of the non-leased land.  (SOF 90-99.)  On January 20, 2010, the BLM granted Standard Steam permission to drill fifteen temperature gradient wells on land to which it held the surface rights.  (WM SOF 90.)  On April 1, 2010, the BLM granted Standard Steam permission to drill ten more temperature gradient wells.  (WM SOF 98.)  Additionally, the State of Nevada issued Standard Steam permits to drill twenty-nine temperature gradient wells between February 5 and March 24, 2010.  (WM SOF 100.)  Some of these wells were drilled on unleased land.

It is undisputed that Standard Steam did not have leases with 100% of the ownership interests in the surface of the Lands.  Thus, the Lease Date could only occur if Standard Steam made "other satisfactory arrangements . . . for the development and use" of the surface rights owned by these entities.  The dispute here centers on what constitutes "other satisfactory arrangements".  The phrase "other satisfactory arrangements" is not defined in the Lease or the Addendum.  Additionally, neither the Lease nor the Addendum allocates the exclusive right to determine what constitutes "other satisfactory arrangements" to Standard Steam or Windfall Minerals.

Where a lease is reasonably susceptible to different constructions or interpretations, it is ambiguous.  *Agric. Aviation Eng. Co. v. Bd. of Clark Cty. Comm'rs*, 794 P.2d 710, 712 (Nev. 1990).   Here, both parties here have put forth a reasonable interpretation of the phrase "other satisfactory arrangements".  Windfall Minerals argues that Standard Steam had made "other satisfactory arrangements" by at least April 13, 2010 because it had permission to drill test wells on portions of all of the surface

property.  (ECF No. 75 at 38.)  Standard Steam contends that it never had "satisfactory arrangements" because it was only permitted to drill test wells, not production wells. (ECF No. 95 at 36.)  Because the Court finds that both of these are reasonable interpretations of the phrase "other satisfactory arrangements, the Court finds that the Addendum is ambiguous.

To resolve ambiguity in a contract, the Court must look at the intention of the parties.  *Agric. Aviation Eng. Co.*, 794 P.2d at 712.  As set forth above, the parties have both set forth reasonable positions regarding their intent with respect to the phrase "other satisfactory arrangements."  Where there is conflicting evidence regarding the parties' intention with respect to an ambiguous contract term, "the credibility of their statements must be decided, which should be an issue for consideration by the trier of fact."  *Agric. Aviation*, 794 P.2d at 713.  Because there is conflicting evidence as to the intent of the parties at the time of contracting, the Court finds that Windfall Minerals' breach of contract claim is not appropriate for summary disposition and Windfall Minerals' Motion for Summary Judgment is denied as to its breach of contract claim.

**B.      Breach of the Duty of Good Faith and Fair Dealing**

In Nevada, the implied covenant of good faith and fair dealing is read into every contract.  *A.C. Shaw Constr., Inc. v. Washoe Cty.*, 784 P.2d 9, 10 (1989); Nev. R. Stat. § 104.1203.  Windfall Minerals brings a claim alleging that Standard Steam breached the duty of good faith and fair dealing.  The parties have filed cross-motions for summary judgment on this claim.  (ECF No. 75 at 37; ECF No. 77.)

Windfall Minerals alleges that Standard Steam breached the covenant of good

faith and fair dealing because its "actions from October 2010 until the filing of this litigation were arbitrary and unfaithful in its attempt to enforce the terms of the Lease." (ECF No. 93 at 30.)  Windfall Minerals contends that Standard Steam "conjured up a pretended dispute and asserted an interpretation contrary to its own understanding of the Lease terms." (*Id.*)

The facts cited by Windfall Minerals in support of its breach of the duty of good faith and fair dealing claim relate to the manner in which Standard Steam has attempted to defend against its obligations under the Lease.  Standard Steam argues that Nevada does not recognize a cause of action for breach of the duty of good faith and fair dealing that arises out of the manner in which one party to a contract attempts to enforce such contract.  (ECF No. 95 at 38-39.)

Nevada courts have generally adopted Section 205 of the Restatement (Second) of Contracts which states: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."  Windfall Minerals relies on the Nevada cases citing this general statement to argue that Nevada has recognized a cause of action for bad faith enforcement of a contract.  However, all of the cases cited by Windfall Minerals involve performance of the contract and whether such performance (or failure to perform) was a breach of the duty of good faith and fair dealing.  Windfall Minerals has failed to cite, and the Court has been unable to locate, any Nevada case actually involving the enforcement of a contract.  Absent a case involving a finding that there was breach of the duty of good faith and fair dealing in the enforcement on a contract, any passing reference to such duty is *dicta*.

The duty to act in good faith with respect to the enforcement of a contract is

outlined in comment (e) to Section 205 of the Restatement, which extends the obligation to act in good faith to "the assertion, settlement and litigation of contract claims and defenses."  Restatement (2nd) of Contracts § 205, cmt. e.  "The obligation is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts."  *Id*.  As Standard Steam points out, although Nevada courts have adopted Section 205 of the Restatement in general, they have never explicitly adopted comment e to Section 205 of the Restatement.

As a federal court sitting in diversity jurisdiction, the Court's duty is to ascertain and "apply the most recent statement of state law by the state's highest court."  *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 513 (10th Cir. 1994).  In applying Nevada state law, the Court is reluctant to expand beyond the bounds set by Nevada's courts.  *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000) (stating "it is not our place to expand Utah state law beyond the bounds set by the Utah Supreme Court").  As set forth above, Windfall Minerals has not shown that Nevada courts have recognized a cause of action for breach of the duty of good faith and fair dealing that arises out of one party's attempts to enforce the contract.  The Court declines to expand Nevada's law to recognize such a claim in these circumstances.

Nevada law permits a claim for breach of the duty of good faith and fair dealing when a party's actions "deliberately contravene[] the intention and spirit of the contract."  *Hilton Hotels v. Butch Lewis Prods.*, 808 P.2d 919, 922-23 (Nev. 1991).  The Lease at issue here was intended to allow Standard Steam to explore and develop the Lands'

geothermal resources.  There is no allegation here that Standard Steam deliberately failed to explore the geothermal potential in the Lands.  In fact, the evidence shows that Standard Steam worked diligently with BLM, the State of Nevada, and the other surface landholders to gain the proper permits to drill test wells.  (SOF 70-108.)  Windfall Minerals fails to cite any evidence in the record showing that Standard Steam deliberately acted in contravention of the spirit of the Lease.  Accordingly, the Court finds that summary judgment in favor of Plaintiff Standard Steam is warranted on Windfall Minerals' breach of the duty of good faith and fair dealing claim.

## C.     Fraudulent Misrepresentation or Non-Disclosure

Standard Steam brings a claim for fraudulent misrepresentation and/or non-disclosure alleging that Windfall Minerals wrongfully concealed the existence of the riparian zone on the surface of the Lands.  (Compl. ¶¶ 26-32.)

To prevail on its fraudulent misrepresentation claim, Standard Steam must show: (1) Windfall Minerals made a false representation or omission; (2) Windfall Minerals knew or believed its representation or omission was false; (3) by making such false representation or omission, Windfall Minerals intended to induce Standard Steam to contract; (4) Standard Steam was justified in relying on the false representation or omission; and (5) Standard Steam suffered damages as a result of such reliance.  *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (Nev. 2004).

Under Nevada law, "the owner of real property is under a duty to inform herself of the true boundaries of the land she seeks to sell, and any breach of this duty and misrepresentation of the true boundaries in the sale of property constitutes constructive

fraud." *Woods v. Label Inv. Corp.*, 812 P.2d 1293, 1298 (Nev. 1991). Standard Steam relies on this precedent to argue that Windfall Minerals had a duty to inform itself as to the existence of the riparian zone on the surface of the Lands, as well as what effect such riparian zone would have on Standard Steam's ability to develop the Lands's geothermal resources. (ECF No. 95 at 47-48.)

This argument fails, however, because it ignores the fact that Windfall Minerals undisputedly was leasing only the Lands' mineral rights to Standard Steam. (WM SOF 33-35.) The Lease explicitly states that Windfall Minerals is leasing to Standard Steam its "title and interest in and to all geothermal rights and resources, and any associated minerals and mineral rights, subsurface water and water rights, and other rights appurtenant". (Lease § 1.) It also states: "The surface of the Lands is or may be owned by parties other than Lessor . . . Lessor does not warrant any right to use to the surface or water or water rights." (Lease § 1.2.) The riparian zone was undisputedly on the surface of the lands. Because Windfall Minerals was leasing only the mineral rights and explicitly disclaimed any interest in the surface rights, under the case law cited above Windfall Minerals would be charged with knowledge and a duty to inform itself as to only the mineral rights in the Lands. Thus, the Court finds that there is no genuine dispute of fact as to whether Windfall Minerals made a knowing misrepresentation or omission as to the status of the surface rights of the Lands.

Moreover, Nevada law also provides that "[i]f the purchaser is aware of facts from which a reasonable person would be alerted to make further inquiry, then he or she has a duty to investigate further and is not justified in relying on the seller's description of the property." *Woods*, 812 P.2d at 1298. The record shows that

Standard Steam was aware, at the time it entered into the Lease, that the Marys River ran across the surface of a portion of the Lands.  (WM SOF 4, 6.)  The fact that a river or stream ran across the surface of the Lands would have put a reasonable person on notice that it may need to inquire further as to whether the existence of such waterway would affect potential development.  Additionally, more than two months before it signed the Lease, Standard Steam was granted a lease by BLM that included restrictions on "ground disturbance[s] within 400 feet of streams and banks."  (WM SOF 16.)  Standard Steam's knowledge of the presence of the Marys River on the surface of the Lands triggered a duty for it to investigate the matter further, and made it unreasonable for Plaintiff to simply rely on Windfall Minerals' description of the Lands.  Accordingly, the Court finds that Standard Steam has also failed to show that it reasonably relied on any alleged fraudulent omission made by Windfall Minerals.

Standard Steam bears the burden of establishing that there is a material factual dispute as to each of the five elements of its fraudulent misrepresentation claim.  *See Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).  Because Standard Steam has failed to show a dispute of fact as to a number of the elements, the Court concludes that summary judgment in favor of Defendant Windfall Minerals on Plaintiff Standard Steam's fraudulent misrepresentation claim is appropriate.

**D.    Breach of Warranty**

Standard Steam also brings a claim alleging that Windfall Minerals' failure to disclose the riparian zone on the surface of the Lands constituted a breach of warranty. (Compl. ¶¶ 33-38.)

"In a breach of warranty cause of action, a plaintiff must prove that a warranty

existed, the defendant breached the warranty, and the defendant's breach was the proximate cause of the loss sustained." *Nevada Contract Servs., Inc. v. Squirrel Cos., Inc.*, 68 P.3d 896, 899 (Nev. 2003).   It is undisputed that the riparian zone was on the surface of the Lands.  Windfall Minerals argues, and the Court finds, that Standard Steam has failed to show that the Lease contained any warranty regarding the interests or rights to the surface of the Lands.  In fact, the Lease explicitly states that Windfall Minerals "does not warrant any right to use the surface or water or water rights."  (Lease § 1.2.)

Accordingly, the Court finds that Standard Steam has failed to show a trial-worthy issue as to an essential element of its breach of warranty claim.  Windfall Minerals is therefore entitled to summary judgment Standard Steam's breach of warranty claim.

### E.   Mutual Mistake

Standard Steam brings a claim for mutual mistake asking the Court to rescind the Lease based on the alleged mutual mistake regarding the riparian zone.  (Compl. ¶ 40.)

Under Nevada law, "a mutual mistake of fact may void a contract and a mutual mistake is a basis for equitable recision of a contract."  *Tarrant v. Monson*, 619 P.2d 1210, 1211 (Nev. 1980) (internal citations omitted).  However, "[o]ne who acts, knowing that he does not know certain matters of fact, makes no mistake as to those matters.  If a person is in fact aware of certain uncertainties a mistake does not exist at all."  *Id*.

Here, the undisputed record shows that Standard Steam knew that the Marys

River ran through at least a portion of the Lands.  (WM SOF 4; ECF No. 75-4 at 18-19.)

The record also shows that Standard Steam assumed that the Marys River would have

some impact on its ability to use the full extent of the Lands.  (WM SOF 6; ECF No. 75-

3 at 10.)  The fact that Standard Steam did not know the full extent of the restrictions

that the BLM would place on the land due to the riparian zone does not mean that there

was a mistake of fact at the time of formation of the Lease.  *See Tarrant*, 619 P.2d at

1211 ("One who is uncertain assumes the risk that the facts will turn out unfavorably to

his interests.")

Because the undisputed facts show that Standard Steam knew of the potential

for restrictions on the Lands due to the existence of the Marys River on at least some of

the subject property, Standard Steam has failed to show a trial-worthy issue as to its

mutual mistake claim.  Windfall Minerals' motion for summary judgment is granted as to

this claim.

**F.     Force Majure**

Standard Steam also seeks rescission of the Lease under the Lease's *force*

*majure* clause.  (Compl. ¶ 41.)  The *force majure* clause provides, in pertinent part, that

"laws, orders, rules, or regulations of Federal, State, County, Municipal, or other

governmental agencies, authorities, or representations" shall excuse Standard Steam's

performance under the Lease for so long as any of the above circumstances exist.

(Lease § 15.1.)

Standard Steam contends that the Lease required it to drill thermal-gradient

wells and that it was not permitted to do so as a result of the BLM restrictions.  (*Id.*)

The Court acknowledges that the Addendum provides for the drilling of test wells. (Addendum § 3 ¶ 3.)  Moreover, it is undisputed that the BLM placed restrictions on Standard Steam's ability to drill test wells in certain portions of the Lands and at certain times of the year.  (WM SOF 90.)  Standard Steam argues that BLM's restrictions caused it to be unable to perform its obligations under the Lease and, therefore, its failure to perform should be excused.  (ECF No. 95 at 45-46.)  However, neither the Lease nor the Addendum require that Standard Steam drill test wells in any particular area or at any particular time of the year.  (*Id*.)  The BLM's restrictions did not prevent Standard Steam from drilling test wells altogether, they simply altered where such wells could be drilled and when they could be operated.

Because the BLM restrictions did not interfere with any obligations imposed on Standard Steam by the terms of the Lease or the Addendum, the Court finds that the *force majure* clause is inapplicable here.  Accordingly, Windfall Minerals' Motion for Summary Judgment is granted as to Standard Steam's claim under the *force majure* clause.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Plaintiff Standard Steam's Motion for Partial Summary Judgment (ECF No. 77) seeking summary judgment on Windfall Minerals' counterclaim for breach of the duty of good faith and fair dealing is GRANTED;

2.      Defendant Windfall Minerals' Motion for Summary Judgment (ECF No. 75) is DENIED in so far as it seeks affirmative summary judgment on its own

counterclaim for breach of the duty of good faith and fair dealing;

3.      Summary judgment shall enter in favor of Standard Steam on Windfall Minerals'

counterclaim for breach of the duty of good faith and fair dealing;

4.      Defendant Windfall Minerals' Motion for Summary Judgment (ECF No. 75) is

GRANTED in so far as it seeks summary judgment on Standard Steam's claims

for fraudulent misprepresentation, breach of warranty, mutual mistake, and *force*

*majure*;

5.      Summary judgment shall enter in favor of Windfall Minerals on Standard Steam's

claims for fraudulent misprepresentation, breach of warranty, mutual mistake,

and *force majure*;

6.      Plaintiff Standard Steam's Motion for Judgment on the Pleadings (ECF No. 66)

seeking judgment on Windfall Minerals' breach of contract counterclaim is

DENIED;

7.      Defendant Windfall Minerals' Motion for Summary Judgment (ECF No. 75) is

DENIED in so far as it seeks affirmative summary judgment on its own breach of

contract counterclaim; and

8.      Windfall Minerals' breach of contract counterclaim shall proceed to trial.  This

case is currently set for a nine-day jury trial commencing Monday, December 3,

2012.  (ECF No. 125.)  Because only one counterclaim remains pending in this

action, counsel for both parties are ORDERED to file, on or before June 5, 2012,

their respective positions on how much the length of the trial in this case can be

shortened given the Court's rulings in the instant Order.

Dated this 31st day of May, 2012.

BY THE COURT:

_____
William J. Martinez
United States District Judge